UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

SEAN ADAMS,

                        Plaintiff,

          v.

THE CITY OF NEW YORK and UNDERCOVER
OFFICER # C0098,

                        Defendants.

----------------------------------------------------------------

**MEMORANDUM & ORDER**
11-CV-2567 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Sean Adams brings the above-captioned action pursuant to 42 U.S.C. § 1983 against Defendants City of New York and Undercover Officer # C0098 (the "Undercover Officer") for false arrest, malicious prosecution and denial of a fair trial. Plaintiff alleges that the Undercover Officer falsely accused Plaintiff, then a juror on a grand jury panel, of threatening him when the Undercover Officer was about to testify before the grand jury. Plaintiff was arrested and charged, which charges were eventually dismissed for legal insufficiency. Trial in this case is scheduled to begin on February 3, 2014. Currently before the Court are the parties' motions *in limine*. By Order dated October 11, 2013, the Court ruled on the parties' motions without explanation. The Court sets forth the reasons for its decisions below.[1] (*See* Docket Entry No. 72).

---

[1] The Court ruled on all but one of the parties' motions on October 11, 2013. The Court reserved decision as to Plaintiff's application to preclude Defendants from presenting evidence that an Assistant District Attorney observed a grand juror attempt to leave the grand jury room. The Court rules on that application in this Memorandum & Order.

## I. Undercover Officer's Testimony at Trial

Defendants request that pursuant to the law enforcement privilege, (1) the Undercover Officer be permitted to observe the trial proceedings by closed-circuit television from another room in the courthouse, (2) the courtroom be closed to the public and Plaintiff during the Undercover Officer's testimony, and (3) the Court explain to the jury that the Undercover Officer is absent for his own safety. (Docket Entry No. 46, Def. Ltr. dated Aug. 16, 2013 at 1.) Defendants assert that the Undercover Officer's "likeness and identity" are protected by the law enforcement privilege. (*Id.*) Defendants further contend that the presumption of an open trial may be overcome by the overriding state interest of (1) maintaining the continued effectiveness of current narcotics enforcement operations and long-term case investigations, and (2) protecting the safety of law enforcement agents. (*Id.* at 3–4.)

Plaintiff asserts that, pursuant to the Supreme Court's decision in *Waller v. Georgia*, 467 U.S. 39 (1984), Defendants have "failed to make a sufficient showing for the extraordinary relief" requested, "the prejudicial effect to [P]laintiff would be extreme" and, to the extent Defendants are relying on the law enforcement privilege, the privilege "relates to discovery and is wholly inapplicable in a trial context." (Docket Entry No. 49, Pl. Ltr. dated Aug. 23, 2013 at 1–4.) Plaintiff also asserts that the law enforcement privilege only applies to the "discovery of documents." (*Id.* at 4.)

### a. Defendants Have Not Met the Standard for the Law Enforcement Privilege

Courts recognize a qualified common law privilege, derived from the executive privilege, protecting the confidentiality of certain information related to ongoing law enforcement activities. *Dinler v. City of New York* ("*In re City of New York*"), 607 F.3d 923, 941 (2d Cir. 2010). The Second Circuit has made clear that the law enforcement privilege is intended "to

2

prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness[es] and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation." *Id.* at 944 (quoting *Dep't of Investigation of City of New York v. Myerson* ("*In re Dep't of Investigation*"), 856 F.2d 481, 484 (2d Cir. 1988).  The law enforcement privilege has been applied to shield the disclosure of an informant's identity during trial, *Roviaro v. United States*, 353 U.S. 53, 59 (1957), the disclosure of "information regarding the identities of Undercover Officers," *MacNamara v. City of New York*, 249 F.R.D. 70, 95 (S.D.N.Y. 2008), and subpoenaed testimony from an FBI agent "concerning the full scope of [a] federal investigation," *Miller v. Mehltretter*, 478 F. Supp. 2d 415, 423 (W.D.N.Y. 2007), although this privilege has recently been applied to documents as well, *see In re City of New York*, 607 F.3d at 950 (holding that "[t]he party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the *documents* in question" (emphasis added) (citing *In re Sealed Case*, 856 F.2d 268, 271–72 (D.C. Cir. 1988))).  Thus, Plaintiff's claim that the privilege only relates to discovery is without merit.

The Second Circuit has articulated a burden-shifting test to analyze claims of law enforcement privilege.  *See In re City of New York*, 607 F.3d at 948.  First, "the party asserting the privilege must demonstrate that the documents contain information that the law enforcement privilege is intended to protect."  *Id.*  Protected information includes information that: (1) "pertain[s] to law enforcement techniques and procedures"; (2) "would undermine the confidentiality of sources"; (3) "would endanger witness and law enforcement personnel"; (4) "would undermine the privacy of individuals involved in an investigation"; or (5) "would seriously impair the ability of a law enforcement agency to conduct future investigations."  *Id.* at

948 (internal quotation marks omitted) (citing *In re Dep't of Investigation*, 856 F.2d at 484 and

*Morrissey v. City of New York*, 171 F.R.D. 85, 90 (S.D.N.Y. 1997)). Once the party successfully

makes this showing, "the district court must balance the public interest in nondisclosure against

'the need of a particular litigant for access to the privileged information[,]'" *id*. (citing *In re*

*Sealed Case*, 856 F.2d at 272), keeping in mind that "[t]here is a 'strong presumption against

lifting the privilege,'" *id*. (citing *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1125 (7th

Cir. 1997)). "To rebut that strong presumption, the party seeking disclosure bears the burden of

showing (1) that the suit is non-frivolous and brought in good faith, (2) that the information

sought is not available through other discovery or from other sources, and (3) that the party has a

compelling need for the privileged information[.]" *Id*. (alterations, citations and internal

quotation marks omitted). Here, Defendants cannot make their initial showing.

Assuming that a testifying witness's physical appearance could be characterized as the

kind of information that may be subject to the privilege, Defendants cannot show that the

Undercover Officer's appearance is "information" that satisfies the factors articulated by the

Second Circuit in *In re City of New York*. Defendants speculate, based on the fact that the

Undercover Officer was recently involved in undercover narcotics and firearms investigations,

and that he is currently involved in daily buy and bust operations, that without the privilege the

Undercover Officer's "confidentiality would be undermined, his investigations could be

compromised, and his life could be endangered." (Def. Ltr. dated Aug.16, 2013 2.) While

maintaining the confidentiality of an Undercover Officer's identity is an important law

enforcement and public interest, painting a picture of possible harms with a broad brush, without

offering concrete details as to how testifying in a civil trial could lead to any of these risks, is

insufficient to permit the Court to take the exceptional step of extending this privilege to shield a

civil trial witness from testifying in an open courtroom. *See Miller*, 478 F. Supp. 2d at 425

(finding that testimony about the nature and dates of contacts between law enforcement agent

and city officials was not subject to law enforcement privilege where party seeking the privilege

could only provide "vague and conclusory statements without any specific or particularized

facts" and did not "explain how disclosure will undermine law enforcement efforts and reveal

law enforcement techniques," nor describe "how such testimony would disclose investigative

techniques and procedures the effectiveness of which would thereby be impaired" (internal

quotation marks and citations omitted)).

      Defendants' reliance on *In re City of New York* to support their request for this

extraordinary relief is misplaced. In that case, the Second Circuit addressed the issue of whether

the City could be required "to disclose, in discovery proceedings, 1800 pages of undercover

Field Reports to over fifty attorneys representing a putative class of some 1200 individuals."

*In re City of New York*, 607 F.3d at 933. The Second Circuit held that the law enforcement

privilege applied to those field reports because "(1) the City has shown that the Field Reports

contain information regarding 'law enforcement techniques and procedures,' and the identity of

undercover officers, and (2) disclosure of the Field Reports could undermine the safety of law

enforcement personnel and would likely undermine 'the ability of a law enforcement agency to

conduct future investigations[.]'" *Id*. at 944–45 (citing *In re Dep't of Investigation*, 856 F.2d at

484; *Morrissey*, 171 F.R.D. at 90). The holding of *In re City of New York* — that hundreds of

pages of police field reports tied to a city-wide policing and investigatory strategy and containing

the identities of multiple Undercover Officers are entitled to protection from pre-trial discovery

— is not expansive enough to support Defendants' proposition that an individual Undercover

Officer, whose name will remain unknown, is entitled to shield his appearance from plaintiff, the

jury, and the public where the City has failed to show that requiring the undercover to appear and testify in open court in this proceeding "would likely undermine [his ability] to conduct future investigations."

### b. Defendants Have Not Shown An Overriding Governmental Interest

Nor have Defendants established that there is an overriding governmental interest to justify the abrogation of the deeply-rooted First Amendment tradition of open trials that would allow for courtroom closure during the testimony of the Undercover Officer. *See Press-Enter. Co. v. Superior Court of California, Riverside Cnty.*, 464 U.S. 501, 505 (1984) (discussing historical roots of open trials in the American tradition). Even in criminal trials, where the opportunity for genuine and specific threats to the safety of Undercover Officers may be significant, courts are held to a strict standard favoring openness of the courtroom. The decision whether to close a courtroom is subject to a four-factor test: "(1) the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, (2) the closure must be no broader than necessary to protect that interest, (3) the trial court must consider reasonable alternatives to closing the proceeding, and (4) it must make findings adequate to support the closure." *Ayala v. Speckard*, 131 F.3d 62, 69 (2d Cir. 1997) (citing *Waller*, 467 U.S. at 48); *see also Brown v. Kuhlmann*, 142 F.3d 529, 538 (2d Cir. 1998) ("[A]n officer's undercover status will not in itself support closure of the courtroom during his testimony."). Here, Defendants assert two overriding governmental interests that are likely to be prejudiced if the Court denies its applications: (1) "maintaining the continued effectiveness of current narcotics enforcement operations and long-term case investigations," and (2) "protecting the safety of law enforcement agents who risk their lives to make the streets safer for citizens." (Def. Ltr. dated Aug.16, 2013 at 3–4.)

### i. Current Operations and Investigations

"The state interest in maintaining the continued effectiveness of an Undercover Officer is an extremely substantial interest," where the state can show that Undercover Officers "were continuing their undercover work and would soon be returning in an undercover capacity to the same areas where the defendants had been arrested," and where "[t]hese areas [are] described with *particularity*," for example, as areas surrounding a particular intersection, a public square, or a street address. *Ayala*, 131 F.3d at 72; *see also McCarthy v. Portuondo*, No. 98-CV-3726, 2001 WL 826702, at *6 (E.D.N.Y. May 25, 2001) ("With respect to this interest, the state may satisfy its burden by demonstrating that the Undercover Officer would return to an area of operation where the defendant had been arrested or where the trial audience might reside, so long as that area is defined with geographic particularity."), *aff'd*, 62 F. App'x 17 (2d Cir. 2003); *Cadilla v. Johnson*, 119 F. Supp. 2d 366, 377 (S.D.N.Y. 2000) (same).

Here, Defendants do not state with particularity the location of the Undercover Officer's operations, nor do they explain how publicly testifying in this civil case may pose anything more than a purely speculative risk to his safety. Defendants note that the Undercover Officer concluded an investigation within approximately the past year "involving the purchase of large amounts of narcotics and a loaded firearm," and that in August 2012 he was the primary Undercover Officer in a case in which he attempted to infiltrate a violent narcotic gang. (Def. Ltr. dated Aug.16, 2013 at 2.) There is no dispute that the incident at issue in the trial before the Court did not result from the purchase of narcotics of firearms or from any gang-related activity but rather from an alleged encounter in a grand jury room. Thus, unlike the facts of the cases considered in *Ayala*, where "[t]he officers in all three cases testified that they were continuing their undercover work and would soon be returning in an undercover capacity to the same areas

where the defendants had been arrested," and "[t]hese areas were described with particularity —
'the area around 1006 Intervale Avenue,' 'Cooper Square,' and 'West 42nd Street and Eighth
Avenue,'" thereby establishing the state's substantial interest in maintaining the effectiveness of
the Undercover Officer, there is no such evidence in this case to support a similar finding. *See
Ayala*, 131 F.3d at 72 (alterations omitted). In addition, Defendants do not specify where the
operations they have identified took place or that any of the identified investigations are ongoing
such that the improbable recognition of the Undercover Officer at this trial by someone involved
in those criminal activities would undermine future or ongoing investigations. Likewise,
Defendants assert that the officer "was / is involved in daily 'buy and bust operations,'" but do
not specify where these took or are taking place, even generally such as which borough, let alone
at the high level of specificity required by the Second Circuit in *Ayala*. *See Brown*, 142 F.3d at
537 (state's asserted "interest in keeping the Undercover Officer's identity secret" was not an
overriding governmental interest justifying the closure of the courtroom where "the State's only
articulated ground of concern was that much of the trial's audience lived in Brooklyn, where the
officer worked." (citations omitted)); *Vidal v. Williams*, 31 F.3d 67, 69 (2d Cir. 1994) (holding
that without more, the fact that defendant's parents live in a "high drug area" in the same
borough where an Undercover Officer works does not justify their exclusion from the courtroom
on the basis of concerns for the officer's cover)*, cert. denied,* 513 U.S. 1102 (1995).

### ii. Safety of Testifying Officer

Nor have Defendants shown that the safety of the Undercover Officer will be
compromised by his appearance and testimony in open court. Courts in this Circuit widely
recognize that protecting the safety of an Undercover Officer can be an overriding governmental
interest justifying the closure of a courtroom. *See, e.g.*, *Gonzalez v. Quinones*, 211 F.3d 735, 738

(2d Cir. 2000) ("We have repeatedly held that, under appropriate circumstances, courts may properly order courtrooms closed during the testimony of undercover police officers, in order to protect both the officers' safety and their future effectiveness."); *United States v. Hernandez*, No. S1-12-CR-809, 2013 WL 3936185, at *1 (S.D.N.Y. July 29, 2013) ("It is axiomatic that the interest in protecting the safety and efficacy of an undercover law enforcement officer constitutes an overriding interest."); *Highsmith v. Donnelly*, No. 99-CV-495A, 2004 WL 1071246, at *6 (W.D.N.Y. Mar. 30, 2004) (denying habeas petition where, inter alia, "trial court . . . found that there were two overriding interests for closing the courtroom during the Undercover Officer's testimony: (1) the officer's safety and (2) her continued effectiveness"). However, they have done so in specific circumstances where the evidence demonstrated that the officer faced a specific threat to safety, such as where an officer was a witness in cases pending in the same courthouse or even in the same borough, or where an officer was actively engaged in undercover operations in the same neighborhood as a criminal defendant's arrest, or had faced prior threats. *See, e.g.*, *Brown*, 142 F.3d at 537 (finding that where "[t]he officer was the main witness in several cases pending in the Manhattan courts where Brown's trial was taking place, and the officer was concerned that his safety would be jeopardized if anyone involved in one of those cases were to enter the courtroom while he was testifying against Brown[,]" the safety of the Undercover Officer "had a stronger basis"); *Rodriguez v. Miller*, 537 F.3d 102, 110 (2d Cir. 2008) (finding that the Undercover Officer's safety was an overriding interest where he "had been threatened before and intended to return to Bushwick in the near future"); *Cotto v. Fischer*, No. 09-CV-9813, 2012 WL 5500575, at *32 (S.D.N.Y. Aug. 23, 2012) (finding that the safety of the Undercover Officers was overriding and "warranted closure of the courtroom" where the Undercover Officers "testified that they would imminently be returning to work in the

neighborhood of [the defendants'] arrest," and the officers had open and ongoing investigations with unapprehended individuals as well as cases pending in the courts), *report and recommendation adopted*, No. 09-CV-9813, 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012) .

Defendants have failed to show that the Undercover Officer faces a genuine threat to his safety if he appears and testifies in an open courtroom.  Defendants' claim that "[P]laintiff (and his family members) should not be afforded the opportunity to view [the undercover], and potentially compromise [the Undercover Officer's] work and safety" assumes that Plaintiff and his family members are sources of danger to the Undercover Officer — an assumption that Defendants do not support with any evidence.  Plaintiff is not a criminal defendant in this case, and as discussed above, his arrest did not result from any of the narcotics, firearms or gang activities that the Undercover Officer claims he has engaged in as part of his undercover duties. Because Defendants' applications to allegedly ensure the Undercover Officer's safety are based on both broad generalizations and unsupported assumptions, the Court finds that Defendants have failed to meet their burden and therefore declines to adopt the measures proposed by Defendants.[2]

---

[2]  The Court received a letter dated January 29, 2014, from James M. Moschella of the law firm of Karasyk & Moschella, LLP seeking reconsideration of the Court's Order denying the Undercover Officer's application to close the courtroom during his testimony and to allow him to observe the trial by closed-circuit television.  (*See* Docket Entry No. 79, Ltr. dated Jan. 29, 2014.)  Mr. Moschella represented in his letter that the law firm serves as General Counsel to the New York City Police Department's Detectives Endowment Association.  (*Id*. at 1.)  In seeking reconsideration, Mr. Moschella states that requiring the Undercover Officer "to testify in open court would endanger his safety, undermine the NYPD's purpose in keeping his identity confidential and compromise investigations conducted by the Organized Crime Control Bureau ('OCCB')."  (*Id*.)  Mr. Moschella then refers to the Defendants' prior submissions as to the Undercover Officer's activities and states that "[s]ome of these operations required gang infiltration that, for obvious reasons, requires the ongoing anonymity of [the Undercover Officer]."  (*Id*.)  No further information is provided about the Undercover Officer's activities. (*Id*.)  As discussed above, Defendants have not met their burden under the law.

The fact that these guidelines emerged in the context of criminal trials and thus are shaped by a criminal defendant's Sixth Amendment right to a public trial does not render them inapposite in this context. While the identification of the government's "overriding" interest in protecting the identity of Undercover Officers from public testimony emerged in the context of a criminal defendant's Sixth Amendment right to confront his accusers, this assessment is no less valid when weighed against the core First Amendment principle of open trials and transparency of the judiciary. There is a rich tradition of openness and transparency in the conduct of *all* judicial proceedings. *See, e.g.*, *New York Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012) ("[T]he First Amendment guarantees a qualified right of access not only to criminal but also to civil trials and to their related proceedings and records." (citations omitted)); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) ("[T]he First Amendment does secure to the public and to the press a right of access to civil proceedings . . . because public access to civil trials 'enhances the quality and safeguards the integrity of the factfinding process,' 'fosters an appearance of fairness,' and heightens 'public respect for the judicial process,' while permitting 'the public to participate in and serve as a check upon the judicial process-an essential component in our structure of self government.'" (quoting *Globe Newspaper Co. v. Superior Court for Norfolk Cnty.*, 457 U.S. 596, 606 (1982))).

Overcoming this deeply-rooted presumption of openness will take more than a nonparticularized assertion of risk to the effectiveness of undercover operations and fear for the safety of the Undercover Officer. Defendants have not shown that they are entitled to any of the relief requested. The application is denied in its entirety.

## II. Motion to Reconsider the Admission of Newspaper Articles and Grand Jury Synopsis Sheet

Defendants argue that the Court should reconsider its July 9, 2013 decision allowing Plaintiff to admit several newspaper articles about the arrest of Plaintiff and upon reconsideration exclude the newspaper articles. (Def. Ltr. dated Aug.16, 2013 at 5.) Defendants argue that the articles are "inadmissible hearsay, and are irrelevant, prejudicial and inflammatory." (*Id.*) Defendants also ask the Court to reconsider its July 9, 2013 decision allowing Plaintiff to introduce the grand jury synopsis sheet prepared by Assistant District Attorney Rebecca Gibson ("ADA Gibson") which contains a statement made by the Undercover Officer. (*Id.* at 5–6.) Defendants argue that the grand jury synopsis sheet is "inadmissible hearsay and should be precluded." (*Id.*) Defendants further argue that it "is cumulative and likely to confuse the jury." (*Id.*) At the July 9, 2013 conference, the Court held that the grand jury synopsis which contained the statement made by the Undercover Officer as recorded by the ADA Gibson was not hearsay and admissible as a statement by a party opponent.[3]

The standard for granting a motion to reconsider a judgment "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995) (citations omitted); *see also* Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (requiring the moving party to "set[ ] forth concisely the matters or controlling decisions which counsel believes the Court has overlooked"); *Smith v. New York City Dep't of Educ.*, 524 F. App'x 730, 734 (2d Cir.

---

[3] The grand jury synopsis also included a statement by Plaintiff that the Court found to be a hearsay statement if offered into evidence by Plaintiff and therefore inadmissible.

2013) ("To warrant reconsideration, a party must 'point to controlling decisions or data that the court overlooked — matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" (quoting *Shrader*, 70 F.3d at 257)); *Smith v. Schweiloch*, No. 12-CV-3253, 2012 WL 2277687, at *1 (S.D.N.Y. June 18, 2012) ("The moving party is required to demonstrate that 'the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion, and which, had they been considered, might have reasonably altered the result before the court.'" (alteration omitted) (quoting *Vincent v. Money Store*, No. 03-CV-2876, 2011 WL 5977812, at *1 (S.D.N.Y. Nov. 29, 2011))). However, because the Court invited the parties to seek reconsideration of any of its decisions made at the conference, (*see* Transcript of July 9, 2013 Pre-Trial Conference ("Tr.") 33), the Court will reconsider its decision based on the additional arguments made by Defendants.

### a. Newspaper Articles

Plaintiff seeks to introduce several newspaper articles from the New York Daily News, Thompson Reuters and other internet articles about his arrest and indictment. (*See* Docket Entry No. 42, Joint Pre-Trial Order filed April 17, 2013 ("Joint Pre-Trial Order")). Counsel proffered at the July 9, 2013 conference that Plaintiff seeks to admit these documents to show that his arrest was highly publicized and to argue that such publicity caused him emotional pain and suffering. (*See* Tr. 19 ("This was a publicized arrest. There were very unflattering headlines about creep arrested and grand jury proceedings. It had his name, his picture. So we feel it's consequential damages.")). At the July 9, 2013 conference the Court ruled that the articles are admissible. (*See* Tr. 19, 32.)

Defendants make three arguments to exclude the newspaper articles: (1) that there is no evidence in the articles or the record that the Undercover Officer, any member of the NYPD or

employee of the City made any of the statements in the articles or have any connection to the articles, rendering the articles unfairly prejudicial, confusing and misleading; (2) they "constitute inadmissible hearsay;" and (3) they are "inherently unreliable and cumulative." (Def. Ltr. dated Aug.16, 2013 at 5.)

First, the issue of whether or not the Undercover Officer, other NYPD officers or employees of the City of New York made any statements in connection with the articles or had any connections to the articles is not relevant to the Court's determination of admissibility because the articles are not being offered for the truth of the matter asserted in them. *Cf. Mandal v. City of New York*, Nos. 02-CV-1234, 02-CV-1367, 02-CV-6537, 2006 WL 3405005, at *2 (S.D.N.Y. Nov. 26, 2006) (admitting as admissions by party opponents portions of newspaper articles and reporter's notes where either direct quotes or specific statements were attributed to individual defendants or their agents). Second, because the articles are not being offered for the truth of the matter asserted in them, the articles are not hearsay. As the Second Circuit has made clear, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." *United States v. Dupree*, 706 F.3d 131, 136 (2d. Cir. 2013); *see also* Fed. R. Evid. 801(c) ("Hearsay means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *Housing Works v. Turner*, No. 00-CV-1122, 2004 WL 2101900, at *4 (S.D.N.Y. Sept. 15, 2004) (noting that newsletter, newspaper articles and other media coverage "of the plaintiff's protected activities . . . cannot be defined as hearsay under Rule 801(c) because the plaintiff h[as] not cited them to prove the truth of the statements they contain"). Here, the newspaper articles are not being offered for the truth of their contents. Plaintiff does not contend that he is a "creep" or that he "threatened" the Undercover Officer. To the contrary, Plaintiff

alleges that he never threatened the Undercover Officer. Plaintiff seeks to introduce the articles not for the truth asserted in the articles but to show that he was damaged as a result of the publicity over his allegedly false arrest.

Nor are the articles unduly prejudicial, confusing, misleading or cumulative as Defendants argue. Rule 403 of the Federal Rules of Evidence provides in pertinent part that "the court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needless presentation of cumulative evidence." *See United States v. Goffer*, 721 F. App'x 113, 129 (2d Cir. 2013) (finding that the district court properly excluded the defendant's rejection of a plea agreement pursuant to Rule 403 as prejudicial and likely to cause jury confusion where "admission would have required the 'collateral consequences' of a conviction to be discussed at length"); *see also United States v. Levy*, No. 11-CR-62, 2013 WL 655251, at *1 (S.D.N.Y. Feb. 22, 2013) (finding that the "probative value of the evidence of the FTC fraud . . . would be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury . . . [because it] would lead to a confusing 'mini-trial' relating to the FTC fraud").

The articles are probative of the publicity generated by the arrest of Plaintiff which bears on Plaintiff's damages. *See United States v. Lesniewski*, No. 11-CR-1091, 2013 WL 3776235, at *8 (S.D.N.Y. July 12, 2013) (declining to exclude tax return which had a "high degree of relevance of the material question" where the defendant argued that it should be excluded because "it would convert the trial into a separate proceeding charging tax fraud"). Moreover, any concerns regarding their admission can be dealt with through a limiting instruction to the jury. *See id.* (finding that "any concerns regarding either prejudice or improper uses of the

evidence . . . can be suitably addressed through a limiting jury instruction"). On reconsideration the Court adheres to its July 9, 2013 decision. The newspaper articles are admissible for establishing damages in Plaintiff's case. The Court will give the jury a limiting instruction regarding the admission of these articles. The parties are directed to submit proposed language to the Court at the beginning of trial.

### b. Grand Jury Synopsis Sheet

Plaintiff seeks to admit the statement of the Undercover Officer that was memorialized by ADA Gibson in a grand jury synopsis sheet. At the July 9, 2013 conference, Defendants objected to the admission of the synopsis sheet on the ground that it is a hearsay statement and should be excluded. (Tr. 15.) The Court understood the statement to have been given to ADA Gibson by the Undercover Officer and ruled that it was not hearsay. (Tr. 16.) Defendants make the same argument made at the pre-trial conference and further argue that the admission of this evidence would be cumulative and "likely" confusing to the jury. (Def. Ltr. dated Aug.16, 2013 at 6.) Defendants additionally argue that the grand jury synopsis sheet should be excluded because the author of the statement, ADA Gibson, will be testifying at trial. (*Id.*)

According to the deposition testimony of ADA Gibson which the Defendants provided to the Court at the October 10, 2013 pre-trial conference, the grand jury synopsis is a business record. Defendants conceded such. Therefore, this document is admissible as a business record. See Fed. R. Evid. 803(6). The fact that ADA Gibson will testify at trial and may testify about the circumstances under which she recorded the Undercover Officer's statements is not a proper basis for the Court to deny the admissibility of otherwise admissible evidence at this stage of the litigation. *See United States v. Jamil*, 707 F.2d 638, 643 (2d Cir. 1983) ("At this stage of the litigation, when the trial has not yet commenced and no evidence has yet been put before a jury,

it is premature to conclude that this evidence is cumulative." (citations omitted)); *United States v. Valle*, No. 12-CR-847, 2013 WL 440687, at *8 (S.D.N.Y. Feb. 2, 2013) (denying Government's motion in limine to exclude the testimony of a second expert witness at trial and stating "[t]o the extent that the testimony of either of these witnesses becomes cumulative at trial, the Court will address the issue at that time"). Nor have Defendants explained why the jury would be confused by the written report of the Undercover Officer's statement to ADA Gibson. On reconsideration the Court adheres to its prior ruling that the grand jury synopsis sheet is admissible, but clarifies that `the basis for admission is the business record exception to the hearsay rule. Despite its admissibility, the Court reserves ruling until trial on Defendants' application that the grand jury synopsis sheet should be excluded as cumulative.

### III. State Malicious Prosecution Claim

Plaintiff moved at the July 9, 2013 conference and again by letter dated August 15, 2013, to amend the Complaint to assert a state malicious prosecution claim against the City of New York. (*See* Tr. 6; *see also* Docket Entry No. 45, Pl. Ltr. dated Aug. 15, 2013 at 1.) Plaintiff timely filed a notice of claim against the City of New York on June 7, 2011, asserting a malicious prosecution claim, (*see* Pl. Ltr. dated Aug. 23, 2013 at 2), and alleged a federal malicious prosecution claim in his Complaint, (Comp. ¶¶ 49 – 61). Plaintiff argues that because "the elements of a federal malicious prosecution are virtually identical to the state malicious prosecution claim, and arise from the same set of facts and allegations and . . . [D]efendants will not be prejudiced[,]" the Court should exercise its discretion pursuant to Rule 15(b) of the Federal Rules of Civil Procedure and allow him to amend the Complaint to allege this claim. (Pl. Ltr. dated Aug. 15, 2013 at 1.)

Defendants argue that Plaintiff should not be allowed to assert a state malicious prosecution claim against the Undercover Officer because (1) neither the Undercover Officer nor any member of the NYPD was named in the notice of claim; and (2) they will be unduly prejudice by this amendment. First, Plaintiff does not seek to amend the Complaint to assert a state malicious prosecution claim against the Undercover Officer. At the July 9, 2013 conference Plaintiff clearly and plainly stated that he was seeking to assert a state malicious prosecution claim against the City of New York, not against the Undercover Officer. At the conference the Court asked "So that's the only issue as to the state law claims, whether or not [P]laintiff should be allowed to proceed with regard to a malicious prosecution claim?" And counsel answered "Yes, your Honor." (Tr. 6.) The Court then asked whether this claim would be against the City of New York to which counsel answered yes. (*Id.*) The Court clarified that this claim was "[n]ot against the undercover[.]" (*Id.*) Defendants understanding that Plaintiff is seeking to amend the Complaint to add this charge against the Undercover Officer is inaccurate.

The Court is not persuaded that allowing Plaintiff to amend the Complaint to assert a state malicious prosecution claim against the City of New York will be prejudicial to Defendants as they argue, where the City of New York was served with a notice of claim and where Plaintiff's Complaint alleges a malicious prosecution claim pursuant to § 1983. The Federal Rules of Civil Procedure provide that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted). Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C.*

18

*Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283). However, motions to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008). "Mere delay . . . absent a showing of bad faith or undue prejudice, does not provide a basis for [a] district court to deny the right to amend." *Azkour v. Haouzi*, No. 11-CV-5780, 2012 WL 3667439, at *2 (S.D.N.Y. Aug. 27, 2012) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citation and internal quotation marks omitted)). "Bad faith exists when a party attempts to amend its pleading for an improper purpose." *Id.* (citing *Austin v. Ford Models, Inc.,* 149 F.3d 148, 155 (2d Cir. 1998) (affirming the district court's denial of leave to amend a complaint where the plaintiff sought to "erase . . . admissions [made] in [the previous] complaint"), abrogated on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

Defendants argue that allowing Plaintiff to amend the Complaint to add a state law malicious prosecution claim "will only confuse the jury and thus prejudice" the Undercover Officer, and "would be unduly prejud[ical]" to Defendants because no "*respondeat superior* claims were plead[ed] in the Complaint or in the notice of claim" and Plaintiff is only seeking "to add the City of New York as a defendant on the verdict sheet." (Docket Entry No. 47, Def. Ltr. dated Aug. 23, 2013 at 3.) Defendants also argue that allowing Plaintiff to assert this claim "would not assist the parties at trial . . . [because] the malicious prosecution claim under state law involves the same facts and the same allegations as the federal malicious prosecution claim." (*Id.* at 2.) Defendants further argue that allowing this claim to proceed against the City of New

York would allow Plaintiff to "present evidence to the jury that another unidentified police officer made this statement (or was somehow involved in this incident)." (*Id.* at 3.)

In evaluating prejudice, courts "generally consider whether the assertion of the new claim or defense would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Monahan*, 214 F.3d at 284 (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)). Courts should be "hesitant to allow amendment where doing so unfairly surprises the non-movant and impedes the fair prosecution of the claim." *Id.* The Second Circuit has identified prejudice to the opposing party resulting from a proposed amendment as among the "most important" reason to deny leave to amend. *AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 725 (2d Cir. 2010).

Defendants' argument that they would be unduly prejudiced to allow this claim because no *respondeat superior* claims were pled in the Complaint or notice of claim has no merit in law or facts. Courts in this Circuit have repeatedly held that where a plaintiff files a notice of claim against the City, the plaintiff does not need to include the specific words "*respondeat superior*" so long as the notice of claim "gives the city enough information to investigate the incident at issue." *Cunninham v. New York City*, No. 04-CV-10232, 2008 WL 1944696, at *2 (S.D.N.Y. May 1, 2008); *see also id.* ("Even without including the specific words 'respondeat superior,' we believe that the city was given enough information about the cause of action to be put on notice of this claim."); *Hargroves v. City of New York*, 694 F. Supp. 2d 198, 218 (E.D.N.Y. 2010) ("[W]hile Defendants claim that the notices fail to notify the City that the Plaintiffs intend to proceed against the City on a *respondeat superior* theory of liability, . . . this argument must be

rejected.  Simply filing the notices of claim evinces such an intent, and the Defendants have offered no case that held differently."), *rev'd on other grounds*, 411 F. App'x 378 (2d Cir. 2011).

Defendants argue that the state malicious prosecution claim is "only intended to add the City of New York as a defendant on the verdict sheet," creating the opportunity for the jury to infer that there is a "deep pocket" defendant.  (Def. Ltr. dated Aug. 23, 2013 at 3.)  Defendants argue that Plaintiff should not be permitted to do so where he has withdrawn his federal claims for municipal liability and all other state law claims against the City.  (*Id.*)  However, the timeline of the filings belies this speculation as to Plaintiff's motive — Plaintiff submitted a notice of claim as to the state malicious prosecution claim against the City of New York on June 7, 2011, nearly two years *before* stipulating to the dismissal of all other claims against the City.  (*Id.*)  Plaintiff also asserted his intent to pursue the state law malicious prosecution claim prior to stipulating to the dismissal of the other claims against the City.  (*See* Docket Entry No. 37, Stip. of Partial Dismissal at 2 n.1.)

Defendants' other reasons for opposing the amendment of the Complaint to add the state law malicious prosecution claim are also rejected as without merit.  The fact that the same facts and allegations form the basis of both Plaintiff's state and federal malicious prosecution claims is not a reason for rejecting either claim.  *See Routier v. O'Hara*, No. 08-CV-02666, 2013 WL 3777100, at *5 (E.D.N.Y. July 17, 2013) ("The analysis of the state and federal [false arrest and malicious prosecution] claims are . . . identical and, accordingly, rise and fall together." (citing *Boyd v. City of New York*, 336 F.3d 72, 75, 78 (2d Cir. 2003))).  Nor is Defendants' argument that Plaintiff would be allowed to present evidence to the jury that another police officer potentially made the statement at issue convincing.  There is no factual basis for Plaintiff to

make any argument other than the argument he has asserted throughout the proceedings — that he never threatened the Undercover Officer in the grand jury room.

Defendants cannot show that they are unduly prejudiced by the addition of this state law malicious prosecution claim. Plaintiff's application to add a state law malicious prosecution claim is granted.

## IV. Plaintiff's Prior Employment History

Plaintiff seeks to prevent Defendants from asking any questions about his prior employment history. Plaintiff seeks to exclude evidence that he was disciplined at the High School of Art and Design on December 11, 2011 and evidence that he was terminated from his employment at Niketown. (Docket Entry No. 54, Pl. Mem. Supp. First Mot. in Limine 2.) Plaintiff argues that because he is not seeking lost earnings, any attempt to introduce his employment history is "palpably irrelevant to the claim in this action." (*Id*. at 2–3.) At the July 9, 2013 conference the Court ruled that the case "is not about [P]laintiff's job performance." (Tr. 25.) The Court noted that it is a "case about what happened in the grand jury and whether or not [P]laintiff made certain statements that were threats to th[e] Undercover Officer." (Tr. 25–26.) Defendants voiced no objections. (*Id.*)

Defendants assert that in accordance with the Court's ruling at the July 9, 2013 conference, they only intend to seek to impeach Plaintiff's testimony to the extent he offers any evidence regarding his employment history. (Docket Entry No. 61, Def. Mem. Opp. First Mot. in Limine at 2–4.) The Court expects the parties to abide by its rulings.

## V. Opinion Testimony of Assistant District Attorney

Plaintiff seeks to preclude Defendants from eliciting testimony from any Assistant District Attorney "regarding their opinion on UC 98's credibility." (Pl. Mem. Supp. First Mot. in

Limine 4.)  Plaintiff argues that such testimony is not relevant, is "impermissible vouching . . . and would insurmountably prejudice *all* of the [P]laintiff's claims . . . [and] must be precluded as a matter of law."  (*Id.* at 5.)  Defendants argue that these witnesses should be allowed to testify as to their personal belief that the Undercover Officer was credible since they had to make that assessment in order to determine whether there was probable cause to arrest and prosecute Plaintiff.  (Def. Mem. Opp. First Mot. in Limine 4–5.)

The Second Circuit has made clear that "the credibility of witnesses is exclusively for . . . determination by the jury, and witnesses may not opine as to the credibility of the testimony of other witnesses at the trial." *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (quoting *United States v. Forrester,* 60 F.3d 52, 63 (2d Cir.1995)).  In addition, "witnesses may not 'present testimony in the form of legal conclusions.'" *Id.* at 62 (quoting *United States v. Articles of Banned Hazardous Substances Consisting of an Undetermined Number of Cans of Rainbow Foam Paint*, 34 F.3d 91, 96 (2d Cir. 1994)).  Therefore, the Second Circuit has held that "the issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony.'" *Id.* at 62 (quoting *Rizzo v. Edison Inc.*, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005)), *aff'd* 172 F. App'x. 391 (2d Cir. 2006).  However, the Second Circuit has also held that "if a witness's own *belief* as to probable cause is relevant to the outcome of a case (for example, where a police officer is sued for false arrest, and claims that she believed she possessed probable cause to arrest), that witness's testimony about her own subjective belief may be admissible." *Id.*

In addition, "a lay witness may testify in the form of an opinion, even one that goes to 'an ultimate issue to be decided by the trier of fact[.]'" *Id.* (quoting Fed. R. Evid. 701(b), 704(a)). Rule 701 of the Federal Rules of Evidence has three "specified prerequisites for lay opinion

testimony." *United States v. Garcia*, 413 F.3d 201, 211 (2d Cir. 2005); *see also* Fed. R. Evid. 701. First, it "requires lay opinion testimony to be based on the witness's personal perceptions." *Garcia*, 413 F.3d at 211. Thus, opinions based "on the totality of information gathered by various persons in the course of an investigation, was not admissible before a jury." *Id.* at 213. Second, "[a] lay opinion may be received in evidence only if it is 'helpful' to the jury's 'clear understanding of the witness' testimony or the determination of a fact in issue.'" *Id.* at 213–14 (finding that an agent's summary testimony of the evidence that was based on more than the agent's observations was not "helpful" to the jury) "This 'helpfulness' requirement is designed to provide assurance against the admission of opinions which would merely tell the jury what result to reach." *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 912 (2d Cir. 1997) (alterations and internal quotation marks omitted) (quoting *United States v. Rea,* 958 F.2d 1206, 1215–16 (2d Cir. 1992)). Third, "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life . . . [and] cannot be received as lay opinion if it is based on scientific, technical, or other specialized knowledge." *Id.* at 215; *see also DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378, 381 (2d Cir. 2012) ("The purpose of Rule 701(c) is to 'prevent a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth' in Federal Rule of Civil Procedure 26." (quoting *Garcia*, 413 F.3d at 215)). "[T]he proponent of lay opinion testimony . . . must satisfy the rule's three foundation requirements." *Garcia*, 413 F.3d at 211 (citing *United States v. Grinage*, 390 F.3d 746, 749 (2d Cir. 2004)); *see also Muniz v. United* States, No. 07-CV-2080, 2008 WL 2942861, at * 16 (E.D.N.Y. July 28, 2008) (citing *Garcia*, 413 F.3d at 211). The Second Circuit held in *Garcia* "that the foundation requirements of Rule 701 do not permit a law

enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on his specialized training and experience." *Garcia*, 413 F.3d at 216. Similarly, the Second Circuit found in *DVL* that the proffered testimony was properly excluded because the witness "relied on technical and scientific knowledge in making most of the observations and conclusions in the declarations." DVL, 490 F. App'x at 381.

Defendants argue that "the decision to arrest Plaintiff was a joint decision made by members of the [NYPD] and employees of the Kings County District Attorney's Office" and therefore, "the prosecutor's own beliefs as to probable cause are relevant to the outcome of this trial, and testimony regarding same should be admissible." (Def. Mem. Opp. First Mot. in Limine 4–5.) Defendants argue that "[s]ince the members of the Kings County District Attorney's Office, in conjunction with members of the NYPD, made the decision to arrest Plaintiff, and at least two Assistant District Attorney witness[es] were involved in the preparation and presentation of the case to the Grand Jury, the witnesses' personal beliefs as to whether probable cause existed to arrest and to prosecute [P]laintiff are highly relevant, even where they are not named defendants." (*Id.* at 5.)

"Malicious prosecution occurs when '(1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor.'" *Cameron*, 598 F.3d at 63 (quoting *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir.1997)). "Under New York law, police officers can initiate prosecution by filing charges or other accusatory instruments." *Id.* at 63. The Second Circuit has held that "prosecutors' opinions as to probable cause and complaining officers' credibility are irrelevant in virtually all cases involving claims of malicious prosecution. In such cases, district courts remain bound by the rules of evidence

that normally govern opinion testimony . . . ." *Id.* at 65. "[A] prosecutor's decision *to pursue a prosecution* has no more relevance to the complaining officer's credibility than the implicit relevance shared by all decisions to prosecute." *Id.*; *see also Cruz v. City of New York*, No. 08-CV-8640, 2010 WL 3020602, at *3 (S.D.N.Y. July 27, 2010) ("Where the plaintiff 'alleg[es] that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.'" (quoting *Cameron*, 598 F.3d at 63)); *Davis v. City of New York*, No. 10-CV-0699, 2013 WL 2298165, at *8 (S.D.N.Y. May 24, 2013) ("[T]he issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony." (quoting *Cameron*, 598 F.3d at 54)).

"The prosecutor's actions do not supersede the complaining officer's actions; they only determine whether the officer's actions come to fruition — that is, whether the officer committed the tort of malicious prosecution, or merely *attempted* to prosecute maliciously." *Cameron*, 598 F.3d at 65; *see also Zomber v. Village of Garden City*, No. 09-CV-4637, 2011 WL 4737052, at *2 (E.D.N.Y. Oct. 6, 2011) (same) (quoting *Cameron*, 598 F.3d at 65). Whether police officers are "credible" and "whether or not they had probable cause" are two of the "most important issues" in a malicious prosecution claim, such that impermissible opinion testimony on these issues is considered not to be harmless error. *Cameron*, 598 F.3d at 65.

Based on Second Circuit case law, the Assistant District Attorney witnesses cannot testify about their opinion regarding the Undercover Officer's credibility, or that they determined that the information he provided to them was sufficient to establish probable cause. *See Cameron*, 598 F.3d at 64 (finding that "to the extent a prosecutor's decision to continue a prosecution does represent an acceptance of a police officer's version of events, the character of

26

that implicit vouching is far different from . . . the prosecutor stat[ing] that she believed that photographs in evidence 'corroborated the events . . . recounted by the police officers, and . . . actually strengthened [the] prosecution"); *see also Zomber*, 2011 WL 4737052, at * 2 (excluding "testimony regarding the decision . . . made by the Nassau County District Attorney's Office to seek an indictment on Assault in the Second Degree." (internal quotation marks omitted)).

Defendants attempt to distinguish the facts before the Court by arguing that the decision as to whether to arrest Plaintiff was made jointly by NYPD and the Assistant District Attorneys and therefore everyone should be allowed to testify to their opinion. Defendants misunderstand the Second Circuit's case law. As explained in *Cameron*, the decision by the Assistant District Attorneys to prosecute Plaintiff has no more relevance to the Undercover Officer's credibility than any other decision to prosecute in any given case and therefore has no bearing on the statements made by the Undercover Officer, i.e., the alleged tortious act complained of by Plaintiff. Nor is the ADA's personal opinion as to whether or not there was probable cause to prosecute relevant here — Defendants are charged with malicious prosecution based on the Undercover Officer's actions in initiating the prosecution.[4] Whether or not the ADA moved forward with the prosecution has no bearing on whether the Undercover Officer can be held liable for his actions, *although it may have a bearing on the issue of damages*. Whether or not

---

[4] Defendants' reliance on *Cameron v. City of New York*, 598 F.3d 50 (2d Cir. 2010), to support their argument that the Assistant District Attorneys should be allowed to testify about their belief as to the existence of probable cause is misplaced. (*See* Docket Entry No. 61, Oct. 4, 2013 Ltr. at 5 (quoting *Cameron*, 598 F.3d at 62 ("On the other hand, if a witness's own *belief* as to probable cause is relevant to the outcome of a case (for example, where a police officer is sued for false arrest, and claims that she believed she possessed probable cause to arrest), that witness's testimony about her own subjective belief may be admissible")). The Undercover Officer is free to testify as to his own beliefs as to whether he possessed probable cause to initiate prosecution because his own beliefs are relevant to the outcome of the case. The personal beliefs and opinions of the Assistant District Attorneys involved are not relevant in the same manner.

the decision as to probable cause was made jointly by the Undercover Officer and the ADAs is irrelevant since, without the Undercover Officer's statements regarding the alleged threat, there would be no basis for any action on the part of the ADA. Defendants have not convinced the Court that any ADA should be allowed to opine on the credibility of the Undercover Officer, testify that his statements were sufficient to establish probable cause, or otherwise testify as to their own beliefs as to probable cause.

Plaintiff's application to preclude the opinion testimony of various Assistant District Attorneys as to the credibility of the Undercover Officer is granted. The Court additionally rules that pursuant to *Cameron*, the Assistant District Attorneys cannot opine as to their beliefs that the Undercover Officer's statement was sufficient to establish probable cause to arrest Plaintiff, although they can testify as to what actions, if any, they took as a result of the Undercover Officer's statement.

## VI. Testimony of Alleged Flight by Grand Juror

Plaintiff seeks to exclude Defendants from presenting evidence that Plaintiff attempted to flee the grand jury room after the alleged incident. (Pl. Mem. Supp. First Mot. in Limine 5–6.) According to Plaintiff, Assistant District Attorney Robert Isdith ("ADA Isdith") testified during his deposition in this proceeding for the first time about his observations regarding Plaintiff's alleged attempt to leave the grand jury room after he allegedly threatened the Undercover Officer. (*Id.*) ADA Isdith did not tell any of the ADAs who prosecuted Plaintiff about this observation, (*see* Pl. Mem. Supp. First Mot. in Limine 5–6, Def. Mem. Opp. First Mot. in Limine 4), and thus, as Plaintiff argues, the ADAs who prosecuted Plaintiff were not aware of these allegations when they initiated the criminal proceedings against Plaintiff, (Pl. Mem. Supp. First Mot. in Limine 5—6). According to Defendants, both ADA Isdith and Assistant District

Attorney Michael Brenner ("ADA Brenner") observed Plaintiff attempt to leave the grand jury room. (Def. Mem. Opp. First Mot. in Limine 6–7.) The alleged attempt to leave the grand jury room by Plaintiff was not observed by the Undercover Officer and was not communicated to him by the ADAs. Plaintiff also notes that these allegations were never presented to the grand jury who heard the evidence against Plaintiff. (*Id.*) Plaintiff argues that this "testimony is too remote and too speculative to be admissible . . . [and] would be unduly prejudicial" to Plaintiff. (*Id.*) Plaintiff also argues that the evidence is irrelevant. (*Id.*)

Defendants assert that although ADA Isdith did not communicate his observations of Plaintiff allegedly fleeing the grand jury room to anyone, and while they are unsure whether Assistant District Attorney Brenner did communicate his observations of Plaintiff allegedly fleeing the grand jury room to the prosecuting ADAs, that, nonetheless, "this evidence is relevant to the probable cause analysis since flight is a factor that can be considered to establish probable cause." (Def. Opp. First Mot. in Limine 6–7 (citing *United States v. Martinez-Gonzalez*, 686 F.2d 93, 100 (2d Cir. 1982); *Morgan v. Superintendent*, 88 F. Supp. 2d 312, 317 (S.D.N.Y. 2000); *Wieder v. City of New York*, No.09-CV-3914, 2013 WL 1810751 (E.D.N.Y. Apr. 29, 2013))).

The existence of probable cause is a "complete defense to an action for false arrest," *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) and *Broughton v. State,* 37 N.Y.2d 451, 456–58 (1975)), and "will defeat a claim of malicious prosecution," *Fabrikant v. French*, 691 F.3d 193, 215 (2d Cir. 2012) (citing *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) and *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). Defendants do not explain, however, how the flight of an alleged suspect can be relevant to the probable cause analysis *if it was not known* to the arresting

officers or other individuals responsible for making a probable cause determination and deciding whether to proceed with the prosecution. Thus, in all of the cases relied on by Defendants to support the proposition that flight is relevant to the determination of probable cause, the flight of the suspect was visible or otherwise known to the arresting officer. *See Martinez-Gonzalez*, 686 F.2d at 100 (holding that "probable cause to arrest Martinez for suspected possession of narcotics arose once Martinez turned and fled"); *Morgan*, 88 F. Supp. 2d at 317 (holding that habeas petitioner's act of "fle[eing] and . . . not stop[ping] even when ordered to do so by uniformed police officers" contributed to the totality of the circumstances creating the probable cause to justify officers' arrest of the petitioner); *Wieder*, 2013 WL 1810751 at *8 (holding that Plaintiff's flight, considered in conjunction with other evidence observed by defendant officers prior to an arrest, gave rise to probable cause justifying that arrest).

Likewise, the Second Circuit has stated that, "[a] court 'must consider [only] those facts available to the officer at the time of the arrest and immediately before it,'" when considering whether an officer has probable cause to arrest. *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013) (alteration in original) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)); *Waldron v. Milana*, --- Fed. App'x ---, ---, 2013 WL 4733215, at *2 (2d Cir. Sept. 4, 2013) (same). Thus, in the context of false arrest and malicious prosecution, courts have rejected evidence that arose *subsequent* to an arrest or the initiation of a prosecution as probative of probable cause. *See, e.g.*, *Wieder*, 2013 WL 1810751, at *7 n.5 ("because these facts came to light after Plaintiff's actual arrest, they are irrelevant to the question of whether the officers had probable cause"); *Vazquez-Mentado v. Buitron*, No. 12-CV-0797, 2013 WL 2318636, at *6 (N.D.N.Y. May 28, 2013) ("One of the purposes of probable cause and warrant requirements and the extensive jurisprudence on the issues is to ensure that *post facto* knowledge or information is

not used to justify arrest and detention." (collecting cases)); *Spruill v. Levy*, No. 04-CV-7316,

2008 WL 2413899, at *4 (S.D.N.Y. June 12, 2008) ("The police may not rely on information

gained after-the-fact to show that probable cause existed at the time of arrest." (citing *Saleh v.*

*City of New York,* No. 06-CV-1007, 2007 WL 4437167, at *8 (S.D.N.Y. Dec. 17, 2007)));

*Campbell v. City of New York*, No. 02-CV-5186, 2004 WL 943570, at *4 (S.D.N.Y.

April 30, 2004)), *report and recommendation adopted*, No. 04-CV-7316, 2008 WL 3884358

(S.D.N.Y. Aug. 21, 2008).

Here, the Undercover Officer was not aware of the alleged flight by Plaintiff when he

engaged in the action that is the subject of this lawsuit — initiating prosecution by reporting an

allegedly false statement to the Assistant District Attorney.  Nor was anyone else involved in

Plaintiff's prosecution, or the grand jury, ever made aware of the alleged flight.  Because this

evidence never even surfaced until ADA Isdith was deposed for the instant litigation, it could not

have possibly contributed to the determination of probable cause at the time of Plaintiff's arrest

and prosecution, as Defendants argue.  ADA Isdith's testimony is not admissible to establish

probable cause.

However, ADA Isdith's testimony is relevant to another disputed element of plaintiff's

claim — whether the Undercover Officer fabricated the statement he claims to have heard the

Plaintiff make.  The Court finds it incredulous that such relevant information allegedly observed

by two ADAs was never communicated to their colleagues — the ADAs prosecuting the Plaintiff

for allegedly making a threat against the undercover — and that this information only came to

light 22 months after the alleged threat during depositions in this action by Plaintiff.  Clearly this

"relevant information" would have been extremely relevant in the criminal prosecution which

was dismissed for legal insufficiency.  However, because it does bear on the question of whether

the Undercover Officer fabricated his statement, Plaintiff's application to exclude testimony regarding his alleged attempted flight from the grand jury room is denied.

## VII.  Disciplinary Histories and Prior or Current Lawsuits

Defendants moved pursuant to Rule 404(b) of the Federal Rules of Evidence to prevent Plaintiff from questioning the Undercover Officer and any other law enforcement officer about their "disciplinary history or any prior or current lawsuits."  (Docket Entry No. 57 Def. Mem. First Mot. in Limine 3.)  At the pre-trial conference on October 10, 2013, counsel for Plaintiff informed the Court that Plaintiff is not seeking to admit any prior or current lawsuits against any of the law enforcement witnesses.  This application is therefore denied as moot.

## VIII.  City as Defendant and Defendants' Attorneys as "City Attorneys"

Defendants argue that Plaintiff should be "precluded from mentioning or offering any evidence that the City is (or was) a defendant in this matter, and [t]he City of New York should be removed from the caption on the Jury Charge and Verdict Sheet."  (Def. Mem. First Mot. in Limine 6.)  Defendants argue that even if the Court orders that Plaintiff can amend the Complaint to plead his state law malicious prosecution claim against the City, as the Court does here, since "the only way the City could be held liable is vicariously . . . [any] mention of the City as a defendant is unnecessary, and risks causing prejudice to [the Undercover Officer] and creating confusion for the jury."  (*Id.* at 7.)  Defendants' argument is flatly rejected.  Where, as here, the City of New York is a Defendant in the case, the City of New York will be listed on all documents and will be identified to the jury.  The Court also rejects Defendants' request that the Court not refer to the City attorneys as "City attorneys."  The Court does agree and orders Plaintiff that it cannot present any evidence that the City will indemnify the Undercover Officer should the jury find him liable.  *See Edwards v. City of New York*, No. 08-CV-2199, 2011 WL

2748665 (E.D.N.Y. July 13, 2011) ("Indemnification is not relevant to any issue before the jury and plaintiff will not be permitted to inform the jury that defendant might be indemnified by the City." (citing *Williams v. McCarthy*, 2007 WL 3125314 (S.D.N.Y. October 25, 2007))); *Jean-Laurent v. Hennessy*, 840 F. Supp. 2d 529, 550 (E.D.N.Y. 2011) (precluding plaintiff from introducing evidence that City of New York may indemnify individual defendants, because "[i]ndemnification is not relevant to any issue before the jury" (citations omitted)); *Hernandez v. Kelly*, No. 09-CV-1576, 2011 WL 2117611, at *6 (E.D.N.Y. May 27, 2011) (barring introduction of evidence and argument regarding City's potential indemnification of defendant police officers where City was not a party to the action, finding such mention would be prejudicial against defendants).

### IX. Cross-Examination of ADAs and Law Enforcement Witnesses

Plaintiff's witnesses include several Assistant District Attorneys (ADAs). (Docket Entry No. 42, Proposed Joint Pretrial Order of April 17, 2013.) Defendants move to preclude Plaintiff "from eliciting any testimony, or presenting any evidence regarding any alleged failure to investigate in this case," based on Plaintiff's questioning of the ADAs during discovery regarding their failure to further investigate the alleged death threat reported by the Undercover Officer. (Docket Entry No. 69, Def. Mem. Second Mot. in Limine 2–3.) Defendants argue that the arresting officer — who was not the Undercover Officer — had probable cause to arrest Plaintiff once he received information about the alleged death threat from the Undercover Officer, and was not required to investigate further. Therefore, Defendants argue, Plaintiff should be precluded from introducing evidence regarding any purported failure to investigate, either by the arresting officers or by the ADAs involved in making the decision to arrest

Plaintiff, as it will only serve to confuse the jury and unduly prejudice the Undercover Officer. (*Id.*)

At the October 10, 2013 pre-trial conference, counsel for Plaintiff argued that Defendants mischaracterize the information he seeks to elicit from the testifying ADAs. Counsel stated that this line of questioning was not designed to establish a failure to investigate, but rather to establish the impact of information withheld by the Undercover Officer at the time of arrest — specifically, the fact that the Undercover Officer heard the alleged threat but did not see the individual who made the threat. Counsel represented that during the deposition of ADA Sue-Ellen Bienenfeld, who participated in making the decision to arrest Plaintiff, ADA Bienenfeld testified that if she had known the fact that the Undercover Officer heard the statement but did not see who made the statement, rather than just the Undercover Officer's statement that Plaintiff threatened him, she would have taken additional steps to identify Plaintiff as the source of the threat. Plaintiff asserts that the alleged threat was not just false, but also misleading when conveyed to the ADA because of the Undercover Officer's failure to inform the ADA that he did not see who made the statement. Defendants responded that this line of inquiry is nonetheless not relevant and that it is prejudicial.

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York," *Manganiello v. City of New York*, 612 F.3d 149, 162 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir.2003)), as well as to a claim of false arrest, *Smith v. Tobon*, 529 F. App'x 36 (2d Cir. 2013) (citing *Williams v. Town of Greenburgh*, 535 F.3d 71, 78–79 (2d Cir. 2008)). Although, as Defendants correctly note, an "indictment by a grand jury creates a presumption of probable cause . . . [t]hat presumption may be rebutted . . . by evidence that the indictment was procured by fraud, perjury, the suppression

of evidence or other police conduct undertaken in bad faith." *Manganiello*, 612 F.3d at 162 (internal quotation marks omitted) (quoting *Savino*, 331 F.3d at 72); *see also McClellan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006) ("[T]he presumption of probable cause created by the grand jury indictment . . . is rebuttable, and may be overcome by evidence establishing that the police witnesses have not made a complete and full statement of facts, that they have misrepresented or falsified evidence, or otherwise acted in bad faith." (alteration, citation and internal quotation marks omitted)). The alleged death threat was the only item of evidence presented to the grand jury which found probable cause to return an indictment against Plaintiff. *See People v. Adams*, No. 561/11, slip opinion (Kings Co. April 5, 2011).[5] Thus, the question of whether that indictment was secured through bad faith remains one for the jury to determine. There is, however, a difference between the role of the ADA's testimony in providing what is essentially expert opinion witness to bolster or undermine the credibility of the Undercover Officer in his determination of whether there was probable cause, and in providing factual context from which a jury can determine whether the Undercover Officer's statements to her were made in bad faith.

To the extent that the ADA's testimony is intended to raise an inference as to whether there was probable cause to arrest Plaintiff, such use in inadmissible. *See Cameron*, 598 F.3d at 62 ("[T]he issue of whether or not probable cause to arrest exists is a legal determination that is not properly the subject of expert opinion testimony." quoting *Rizzo v. Edison Inc.*, 419 F. Supp. 2d 338, 348 (W.D.N.Y. 2005), *aff'd* 172 Fed. App'x. 391 (2d Cir. 2006)). However, the fact that the Undercover Officer did not convey to the ADA that he had not seen who made the alleged threat is relevant to the issue of whether the Undercover Officer's actions were taken in bad faith. Similarly, the Undercover Officer's decision not to tell the ADA that he did not see who

_____

[5] The Court notes that the two-count indictment against Plaintiff was dismissed for legal insufficiency. *See People v. Adams*, No. 561/11, slip opinion (Kings Co. April 5, 2011.)

made the alleged threat and the effect that information would have had on the ADA had the undercover "accurately" reported the alleged threat are relevant to a determination of the malice element of a malicious prosecution claim. *See Manganiello*, 612 F.3d at 163 ("[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.") Defendants' application is denied. The Court will give the jury a limiting instruction regarding the admission of the ADA's testimony. The parties are directed to submit proposed language to the Court at the beginning of trial.

### X. Conclusion

For the reasons set forth above:

1) Defendants' application to fully or partially close the courtroom or otherwise shield the Undercover Officer from open testimony and to allow him to observe the trial proceeding by closed-circuit television from another room in the courthouse is denied.

2) Defendants' motion to reconsider the admission of newspaper articles and the grand jury synopsis sheet is granted. On reconsideration (a) the Court adheres to its ruling admitting the newspaper articles, (b) the Court finds the grand jury synopsis sheet admissible as a business record but defers ruling on whether it should be excluded as cumulative until trial.

3) Plaintiff's application to amend the Complaint to assert a state law malicious prosecution claim against the City of New York is granted.

4) The Court expects the parties to adhere to its July 9, 2013 ruling regarding questions about Plaintiff's prior employment. Any evidence regarding Plaintiff's prior employment are admissible solely for impeachment, should Plaintiff raise these issues on direct examination. The Court will give the jury a limiting instruction regarding the admission of this evidence.

5) Plaintiff's application to preclude Defendants from eliciting testimony from any ADA regarding their opinion as to the Undercover Officer's credibility, or regarding their personal opinion of probable cause, is granted.

6) Plaintiff's application to preclude Defendants from presenting evidence that Plaintiff or another unknown individual attempted to flee the Grand Jury room after the alleged incident is denied. The admissibility of the evidence is relevant to whether the Undercover Officer fabricated the alleged death threat, and not admissible to establish whether there was probable cause to arrest Plaintiff.

7) Defendants' application to preclude Plaintiff from inquiring of the Undercover Officer or any other officer about their disciplinary history or prior or current lawsuits is denied as moot.

8) Defendants' application to preclude Plaintiff from mentioning or offering evidence that the City is a Defendant, or from referring to Defendants' attorneys as "City attorneys" is denied. Defendants' application to preclude Plaintiff from stating that the City will indemnify the Undercover Officer is granted.

9) Defendants' application to preclude Plaintiff from eliciting testimony or evidence regarding a purported failure to investigate is denied. The Court will give the jury a limiting instruction regarding the admission of this evidence.


SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: January 29, 2014
       Brooklyn, New York